# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ANGEL AUBRY,                                     Case No. 1:11-cv-139
      Plaintiff                                Dlott, J.
                                                 Litkovitz, M.J.

  vs

COMMISSIONER OF                                  **REPORT AND**
SOCIAL SECURITY,                                 **RECOMMENDATION**
    Defendant

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of

Errors (Doc. 8), the Commissioner's response in opposition (Doc. 11), and plaintiff's reply

memorandum. (Doc. 14).

## I. Procedural Background

Plaintiff filed an application for DIB in October 2005, alleging disability since March 3,

2005, due to a ruptured disc, bone spur, degenerative disc disease, left rotator cuff problems,

tingling and numbness in her left hand, migraine headaches and pain in her left shoulder.

Plaintiff's application was denied initially and upon reconsideration. Plaintiff, through counsel,

requested and was granted a de novo hearing before ALJ Larry Temin. Plaintiff and a vocational

expert (VE) appeared and testified at the ALJ hearing. On August 21, 2009, the ALJ issued a

decision denying plaintiff's DIB application. Plaintiff's request for review by the Appeals

Council was denied, making the decision of the ALJ the final administrative decision of the

Commissioner.

## II. Medical Evidence

Plaintiff suffered a work-related injury to the left side of her neck which also involved the shoulder and thoracic spine on April 15, 2004. (Tr. 256). Plaintiff was seen by orthopedist Dr. Jonathan Bell, M.D., on October 27, 2004, for evaluation of cervical, lumbar and left shoulder pain. (Tr. 256-57). Dr. Bell noted that plaintiff was initially seen at the emergency room following her injury and diagnosed with a sprain. (Tr. 256). Dr. Bell reported that plaintiff underwent chiropractic treatments, which increased her pain, and attended physical therapy, which helped the lumbar spine but did not alleviate her cervical spine stiffness. (*Id.*). Dr. Bell reported plaintiff had undergone an MRI of the left shoulder on October 20, 2004, which was significant for a supraspinatus tendonopathy around the insertion site, but no labral tear was noted in the left shoulder. (Tr. 256, 258).

On clinical examination, plaintiff had decreased range of motion of the cervical spine. Her deep tendon reflexes were intact and symmetrical. Her upper extremity and lower extremity motor strength was 5/5 throughout. She had full forward flexion and abduction of the bilateral shoulders with pain in the left shoulder. Her left shoulder internal rotation was slightly decreased with pain. No tenderness to palpation was found throughout the shoulder. Her rotator cuff strength was intact with pain on resistance. X-rays of the cervical spine were negative. Dr. Bell's findings were consistent with a left shoulder rotator cuff tendinitis, a cervical spine strain, and possibly a cervical radiculopathy. Dr. Bell offered plaintiff a Celestone and Marcaine injection to the left shoulder, but plaintiff refused. (Tr. 257).

An EMG/NCV of plaintiff's left arm and neck in November 2004 was normal with no EMG evidence of cervical radiculopathy, plexopathy, ulnar neuropathy or carpal tunnel

2

syndrome. (Tr. 253). A cervical spine MRI taken in November 2004 showed some reversal of normal lordotic curve centered at C5-6 and a disc/spur with moderate spinal stenosis noted with probable mild cord compression. (Tr. 251). At C4-5, a disc/spur was noted with mild spinal stenosis but no gross cord compression. (*Id.*).

In December 2004, based on the MRI results, plaintiff's left shoulder pain, and the clinical findings, Dr. Bell referred plaintiff to orthopedic surgeon Dr. Alfred Kahn, III, M.D. (Tr. 248-49). Dr. Bell gave plaintiff an injection, placed her on exercises for rotator cuff stretches and strengthening, renewed her work limitations, and precluded overhead use of the left arm. (Tr. 250).

Dr. Kahn initially saw plaintiff on January 10, 2005. (Tr. 380-82). He noted that plaintiff worked 12 hours a day lifting up to 25 pounds. Plaintiff complained of pain in the shoulder with weakness in the arm and tingling into the hand with loss of control of the hand at times. On examination, she had full range of motion with pain at the extremes. She was tender to palpation at C5-6. Her reflexes were symmetrically equal at the biceps, triceps, and brachial radialus. She had a full grade of weakness in the biceps and triceps on the left as compared to the right and in the intrinsics of the hand. She had a C6 sensory deficit. There was no obvious atrophy. X-rays revealed narrowing with a loss of cervical lordosis at C5-6 and an MRI showed a degenerative herniated disc at C5-6. Dr. Kahn diagnosed a degenerative herniated disc at C5-6 with cord changes of myelomelacia. (Tr. 380). Dr. Kahn gave plaintiff an epidural injection to determine if her neck problem was causing headaches and shoulder problems, and he placed her on a 20-pound lifting restriction until further notice. (Tr. 381). The following month Dr Kahn

3

continued the lifting restriction, noting that plaintiff's employer had told her she needed to either return to her regular duties at work or go on disability. (Tr. 379).

An MRI of the cervical spine taken in March 2005 revealed (1) a mild-moderate disc bulge at C5-6 that flattened the central and leftward cord and contributed to left foraminal stenosis, and (2) mild-moderate bilateral foraminal stenosis at C4-5, greater on the left. (Tr. 471). After reviewing these MRI results the following week, Dr. Kahn noted plaintiff had "a true disc herniation at 5-6 with foraminal stenosis at C4-5. She may well need to have both levels done at some point." (Tr. 379). Dr. Kahn reported, "Temporary total disability at this point 3 months." (*Id*.).

Plaintiff received epidural steroid injections in her neck in April 2005. (Tr. 467-69). The following month, Dr. Kahn reported that the injections did not benefit plaintiff; he believed she was at maximum medical improvement and did not believe she was going to improve without surgical intervention; she needed to decide whether she wanted to have surgery; and she needed to have her workers' compensation claim settled and then decide "whether she wants to do something that is sedentary in nature as she cannot do heavy work with what she has. That is again a decision she needs to make." (Tr. 378).

Dr. Kahn performed an anterior cervical diskectomy and spine fusion at C4-5 and C5-6 on February 2006. (Tr. 358-62). Upon discharge, plaintiff was to wear a cervical collar, she was limited to lifting five pounds, and she was restricted from overhead lifting. (Tr. 359). Two months post-surgery, plaintiff reported some C7 parasthesias below her fusion. (Tr. 374). In May 2006, Dr. Kahn reported that plaintiff was "on permanent disability and should remain so." (Tr. 373). He reported she was having "some residual sequalae including lots of discomfort in

4

her neck" for which he was having her use Aleve. (*Id.*). He recommended aquatherapy and other warm water routines. (*Id.*). Five months post-surgery, Dr. Kahn noted that plaintiff's fusion had healed. (Tr. 372). He reported that she had "some funny symptoms" which he suspected were not necessarily related to her neck and for which she should consult a neurologist if they continued. Dr. Kahn concluded: "She should be on [] permanent disability if she is unable to function in a factory setting. At this point we will put her at maximum medical improvement and have her have a permanent disability rating made." (*Id.*).

Ten months later, in May 2007, plaintiff complained of recurrent right arm pain going into her fingers. (Tr. 476). Dr. Kahn noted apparent "weakness on the right side in the biceps, triceps by about a grade" as well as a C6 sensory deficit. (*Id.*). Dr. Kahn obtained x-rays, which showed a solid fusion at C4-5/5-6. (*Id.*).

Plaintiff treated with chiropractor Dr. Robert Spees, D.C., from August through November 2006. (Tr. 445-66). Dr. Spees opined in November 2006 that plaintiff could perform the following activities for one to four hours: sit, stand, walk, lift 10 pounds, bend and twist, forward reach, perform repetitive motion with the right hand, and operate a motorized vehicle. (Tr. 444). Dr. Spees opined that plaintiff could never reach above the shoulder, perform repetitive motion with the left hand, or climb ladders/stairs. (*Id.*).

On September 17, 2007, a source whose signature is not legible completed a Statement of Disability form at the request of plaintiff's long-term disability insurance carrier. (Tr. 582)[1]. The

---

[1] In her Statement of Errors, plaintiff attributed the report to Dr. Kahn. (Doc. 8 at 2). The Commissioner asserts in his brief that the source who completed the report is unknown but it may have been Dr. Spees. (Doc. 11 at 4). Plaintiff concedes in her reply brief that she mistakenly attributed the report to Dr. Kahn and claims that it was Dr. Spees who authored the report. (Doc. 14 at 2, n.1). The ALJ states in his decision that the author is unknown. (Tr. 21).

report lists a diagnosis of "cervical spine disc displacement" and indicates that plaintiff was

"totally disabled" for an "indefinite" period of time. (*Id.*).

On Dr. Kahn's recommendation, plaintiff underwent a repeat MRI on July 17, 2008. (Tr.

470). The impression was (1) fusion from C4 to C6 with anatomical alignment at the fusion

levels, and (2) no compressive disc pathology at any of the cervical levels. (*Id.*).

Dr. Kahn last saw plaintiff on August 27, 2008. (Tr. 472). His report states, in its

entirety, as follows:

> This lady is in for evaluation [of] her neck. She got the MRI finally, and she does
> have dark disc disease above and below her fusion. They really do not read it, but
> it is definitely there and it is easily seen. She also has some angulation in the disc
> spaces at both 3-4 and 6-7. I do believe that that (sic) is really the issue for her.
> The patient is not anxious to have anything done surgically, and I am not pushing
> her that way. She needs to see a pain doctor, so we will do a pain medicine
> referral and she will need a C9 for that. We will also request physical therapy for
> her. We will also ask for the C9 for depression for her pain.
>
> It is possible that this lady would need to have something done surgically at one or
> the other discs. At this point, we are not going that direction however.

*Id.*

On September 4, 2008, Dr. Kahn completed a "Continuance of Disability Claim Form" at

the request of plaintiff's long-term disability insurance carrier. (Tr. 474). Dr. Kahn checked a

box indicating that plaintiff was "now totally disabled." (*Id.*). He indicated that it was

"indefinite" as to when she would be able to resume any work. *Id.*

On referral from Dr. Kahn, plaintiff saw pain specialist Dr. Sairam Atluri, M.D., of Tri-

State Spine Care Institute in October 2008. (Tr. 477-78). Plaintiff complained of constant

"aching" pain on the left side of her neck going to her left shoulder blade and down to the left

deltoid muscle. (Tr. 477). The pain was better in warm weather and worse in damp and rainy

6

weather. (*Id.*). Plaintiff rated the pain on average as "8" on a "0-10" pain scale. Plaintiff also complained of numbness, tingling and weakness in both arms. (*Id.*). Her current medications were Wellbutrin, Lasix and potassium. (Tr. 478). On examination, Dr. Atluri reported that plaintiff was not in any distress and did not appear to be in severe pain. (*Id.*). Her gait was normal. Plaintiff's neck was supple; there was no tenderness seen in the spinous processes, paraspinal muscles, facets, trapezius, or rhomboid muscles bilaterally. (*Id.*). She had good range of motion of the neck. (*Id.*). There was decreased motor strength and decreased sensory deficits on the left upper extremity. (*Id.*).

Dr. Atluri diagnosed neck pain with cervical sprain. (*Id.*). He reported that plaintiff was not interested in interventional therapy or surgical options. (*Id.*). He noted that she was currently using low-dose opioids (about one-half tablet a day) and he would continue her on those; he noted she may need monitoring; and he planned to set her up for aquatic therapy and psychological modalities. *Id.*

Plaintiff was seen by Dr. E. Gregory Fisher, M.D., for an independent medical evaluation in March 2009 for the purpose of determining whether aquatherapy and a psychological consultation would be appropriate for her allowed conditions. (Tr. 577-81). Dr. Fischer noted that plaintiff had a history of sarcoidosis which was diagnosed in 1997, was treated with medications, and was presently in remission. (Tr. 577). Her current medications included Lasix, potassium, Armore for her thyroid condition, Wellbutrin for depression, and Vicodin 500 mg. one to four times per day for headaches and neck pain. (*Id.*). Plaintiff reported that surgery had helped with the frequency of her headaches and had alleviated her pain by 20 to 25%, but she still had daily pain over the neck area and tingling and weakness over the left upper extremity. (Tr.

7

579). Plaintiff reported seeing Dr. LaRuffa on a monthly basis for evaluation, taking 500 mg. of Vicodin as needed, and calling or seeing Dr. LaRuffa as often as weekly to discuss her pain. (*Id.*). Plaintiff reporting bathing twice daily and using a Jacuzzi twice a day for 40 minutes at a time to relieve some of her pain. She rated her pain on average as a "5" on a "1-10" pain scale, although she reported the pain radiated or elevated to a "10" if she was active in any way or did not take her medication. (*Id.*). Plaintiff reported that her activities basically consisted of sitting or lying around the house taking medication and using the Jacuzzi or taking baths. (*Id.*).

On examination, plaintiff appeared to be in mild discomfort. (*Id.*). She had full range of motion of her neck, shoulder, elbows and wrists bilaterally. (*Id.*). She had normal hand grip bilaterally. (*Id.*). There was no muscle spasm, muscle atrophy, or muscle guarding noted over the cervical area. (Tr. 580). She was nontender and nonpainful over the vertebral border of the scapula bilaterally, the rhomboid muscles, and the trapezius muscles bilaterally. (*Id.*). She had full motor power over the upper extremities, including the shoulder. (*Id.*). She had pain and discomfort on flexion and extension of the neck on the left side and on the left posterior aspect of the neck. (*Id.*). The reflexes over the upper extremities were 2+ and equal. (*Id.*). Sensation over the upper extremities was intact to light touch. (*Id.*). Although plaintiff complained of tingling over the left side of her forearm and lateral two fingers on the left side, the Tinel's sign and Phalen test were negative. (*Id.*). Plaintiff complained of pain and discomfort over the right low back area, pain over the calf region, and "cold" toes and feet. (*Id.*). While there was mild discomfort and pain over the right side of the buttock and sacral area of the back, plaintiff had full range of motion of the back with pain and soreness over the right sacral region; straight leg raising was negative; reflexes were 1+ and equal in knees and ankles; motor power was 5/5 over

8

the lower extremities and sensation was intact to light touch; Homans test was negative; and there were no positive findings in the calf, foot or ankle area. (*Id*.).

Dr. Fisher opined based on the medical records and his own review that plaintiff's thoracic, cervical and left shoulder sprains had resolved and that she had a solidly healed fusion but with continued pain. (*Id*.). He reported that the 2008 MRI showed that the fusion had healed well with no recurrent herniated disc, disc protrusion, cervical canal or foraminal stenosis noted at any level "to account for the pain she is presently having over the involved areas." *Id*. Dr. Fisher concluded that plaintiff continued to have "(1) subjective findings over the neck, shoulder, [and] left upper extremity with (2) minimal objective physical findings and (3) a normal MRI of 2008 showing no recurrent disc herniation or stenosis over the cervical area with a solid fusion over the cervical region, (4) continued use of daily doses of Vicodin 500 mg." (Tr. 581). He "agree[d] with the physicians [that] an evaluation and consultation with a psychiatrist for her 'pain symptoms' stemming from her allowed conditions is reasonable and appropriate." (*Id*.).

A thoracic spine MRI taken on April 6, 2009, showed a small right paracentral disc protrusion at T4-T5 and T6-T7 with mild thecal sac effacement noted; minimal disc bulging at T5-T6 and possible minimal disc displacement at T3-T4; and facet hypertrophy projecting posterior medially in the spinal canal at T10-T11 resulting in thecal sac effacement. (Tr. 499). No significant spinal canal or foraminal stenosis was identified. (*Id*.).

Plaintiff was evaluated for physical therapy on April 14, 2009, following the onset of shoulder blade stabbing pain and burning into the pectoralis region and dizziness the preceding month. (Tr. 517). She also complained of dropping things and daily headaches. (Tr. 518). The physical therapist noted neck stiffness and decreased neck rotation. (Tr. 517).

9

Plaintiff treated with primary care physician Catherine LaRuffa, M.D., from August 1998 to March 2003 and from March 2007 through at least April 2009. (Tr. 520-76). The treatment notes show that Dr. LaRuffa's office treated plaintiff for hypothyridism, obesity, extremity edema, migraine headaches, and depression. (Tr. 530, 535, 536, 537, 538, 539, 540, 543, 544, 545, 546, 547, 548). Plaintiff was prescribed Lasix, Adipex, Skelaxin, Wellbutrin and Vicodin. (*Id.*). A March 31, 2009 progress note reports that plaintiff had gone to the emergency room with various symptoms and had reportedly exacerbated her back pain while chopping wood. (Tr. 528). On April 6, 2009, Dr. LaRuffa prescribed Flexeril. (*Id.*). An April 22, 2009 progress note states that plaintiff was trying to obtain disability benefits based on multiple medical problems. (Tr. 527). Dr. LaRuffa noted decreased range of motion on lateral movement and spasms but did not describe her findings in any detail. (*Id.*). She prescribed Vicodin. (*Id.*).

Dr. LaRuffa completed a "Social Security Disability Questionnaire" submitted to her by plaintiff's counsel on April 22, 2009. (Tr. 521-26). She listed plaintiff's diagnoses as sarcoidosis, degenerative disc disease, hypothyroidism, depression, panic disorder and costochondritis. *Id.* Dr. LaRuffa answered questions on the form as follows: Plaintiff was exhibiting signs and symptoms of cervical radiculopathy based on clinical signs or findings of "Both arms left > right with numbness and tingling"; the objective bases for plaintiff's subjective complaints of chronic severe neck pain and headaches were "C3 not repairable" and "Plates and Screws for Degenerative Disc Disease"; Dr. LaRuffa had prescribed Vicodin and Lanocain patches on a regular basis for plaintiff's pain; in Dr. LaRuffa's opinion, plaintiff's neck and arm pain and headaches would prevent her from concentrating well enough to perform any sort of sustained, regular work activity; plaintiff was not malingering; Dr. LaRuffa had diagnosed

10

plaintiff with, or was aware that plaintiff had been diagnosed with, the low back conditions of "Degenerative Disc Disease - Bulging and protruding Disk to thoracic region - muscle swelling in between ribs"; the basis for plaintiff's sarcoidosis diagnosis was a 1997 lung biopsy; this condition would impose further work-related limitations because it causes "[i]ncreased shortness of breath without any exertion"; and Dr. LaRuffa had prescribed Wellbutrin for plaintiff's depression and psychotherapy was also prescribed. (Tr. 521-24). Dr. LaRuffa also reported that plaintiff had irritable bowel syndrome due to anxiety and that the problem of frequent bathroom visits and stomach pain had become significant, which also resulted in depression because plaintiff did not want to leave home for fear of not being able to reach a bathroom quickly enough. (Tr. 524). Dr. LaRuffa opined that plaintiff could sit and stand/walk for 1 hour in an 8-hour day "with special equipment for neck"; lift/carry 5 pounds occasionally; occasionally bend and squat; and never crawl, climb or reach. (Tr. 525). She also reported that plaintiff needed to lie down frequently due to "medications and/or pain." (*Id.*) Dr. LaRuffa concluded that plaintiff was disabled from performing any level of sustained gainful employment, including "work activity of a sit down nature." (Tr. 526).

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or

in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §

423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.

2. The claimant has not engaged in substantial gainful activity since March 3, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine, status post anterior cervical discectomy and fusion C4-C5 and C5-C6; degenerative disc disease of the thoracic spine; and dysthymic disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). Specifically, she can perform the requirements of work activity except as follows: She can lift/carry up to 10 pounds occasionally and 5 pounds frequently. She can stand and/or walk for up to two hours in an eight-hour workday. She can only occasionally stoop, kneel, crouch, and climb ramps/stairs. She should not crawl or climb ladders/ropes/scaffolds. She cannot perform firm, forceful grasping with the left [hand] beyond the amount of force needed to lift/carry 10 pounds occasionally and five pounds frequently. She should not work at unprotected heights or work around hazardous machinery. She is able to remember and carry out detailed but uninvolved instructions. Her job should not require more than ordinary and routine changes in work setting or duties, and should not require her to make complex work-related decisions.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).[2]

7. The claimant was born [in] . . . 1969 and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (20 CFR 404.1563).

---

[2]Plaintiff's past relevant work was as a factory inspector, loader/sorter, and mail sorter. (Tr. 22).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 3, 2005 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 15-23).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,*

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

14

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

## D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ failed to give proper weight to the opinions expressed by her treating physicians, Drs. Kahn and LaRuffa; (2) the ALJ improperly engaged in his own medical analysis and substituted his medical opinion for that of plaintiff's treating physicians; and (3) the ALJ erred by selectively choosing only that evidence from the record that supported a finding of non-disability.

### 1. The ALJ committed reversible error in weighing and assessing Dr. Kahn's opinion, but not Dr. LaRuffa's opinion.

As plaintiff's first and second assignments of error are interrelated, the Court will consider them together.

Plaintiff claims the ALJ failed to follow the rules for weighing the opinions of a treating physician. Plaintiff alleges the ALJ erred when he failed to give any weight to the reports of her treating orthopedist, Dr. Kahn, and her treating family practitioner, Dr. LaRuffa, and instead relied almost entirely on the report of Dr. Fisher, a physician who performed an independent medical examination for purposes of plaintiff's workers' compensation claim.[3] (Doc. 8 at 6-7).

---

[3]Plaintiff argues in her reply brief that the ALJ also erred by improperly discounting the opinion of Dr. Robert Spees, a treating chiropractor who plaintiff claims authored a 2007 disability form which plaintiff mistakenly attributed to Dr. Kahn in her Statement of Errors. (Doc. 14 at 2, n.1). The ALJ addressed this form in his decision and decided to give no weight to the assessment because the source of the assessment is unknown and there are no specific functional limitations or explanations to support the conclusions in the report. (Tr. 21, citing Tr. 582).

Plaintiff also contends the ALJ erred by failing to give good reasons for rejecting the opinions of

Drs. Kahn and LaRuffa and by not weighing their opinions under the factors set forth in 20

C.F.R. § 404.1527(d)(2)-(6). Plaintiff contends that Dr. Kahn followed her closely for a number

of years and indicated on two long-term disability forms in 2007 and 2008 that he regarded her as

completely unable to perform any type of sustained work activity; yet, the ALJ failed to discuss

Dr. Kahn's disability opinion as well as the results of her 2008 MRI as interpreted by Dr. Kahn.

(*Id.* at 5-6, citing Tr. 470-72, 582, 473-74). Plaintiff also contends that the ALJ erroneously

substituted his own opinion for that of Dr. Kahn with respect to the significance of the 2008 MRI

findings. (Doc. 8 at 7-9). Plaintiff argues it is clear from the ALJ's opinion and remarks he

made at the hearing that he did not consider the MRI findings to be medically significant,

whereas Dr. Kahn felt that the "dark disc disease" and "angulations" shown on the MRI were

medically significant issues for plaintiff. (*Id.* at 8, citing Tr. 72).[4] Plaintiff contends it is

apparent the ALJ decided to reject the opinions offered by both Dr. Kahn and Dr. LaRuffa based

on his improper personal belief that plaintiff's 2008 MRI findings were not medically significant,

and the ALJ compounded his error by ignoring or failing to credit these physicians' opinions in

finding plaintiff to be only partially credible. Plaintiff also asserts that Dr. LaRuffa noted in her

evaluation that plaintiff was still exhibiting signs of cervical radiculopathy, which was consistent

with plaintiff's hearing testimony; Dr. LaRuffa provided an objective basis for plaintiff's

subjective complaints of chronic severe neck pain and headaches - disc problems above and

Plaintiff does not address these findings by the ALJ, and the Court finds the ALJ reasonably disregarded the
September 2007 disability report for the stated reasons.

[4]The ALJ stated at the hearing that he had looked up the term "dark disk disease" and found it "refers to the
fact that on an MRI if the disks are dehydrated they show up dark." (Tr. 72)

below the fusion level and the presence of plates and screws; and Dr. LaRuffa verified that plaintiff would need to lie down from time to time due to pain and side effects from her medications. (*Id*. at 6).

The treating physician rule mandates that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. § 404.1527(d)(2)).

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citing 20 C.F.R. §404.1527(d)(2)). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. (citing SSR 96-2p). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Id.* (citing *Wilson*, 378 F.3d at 544). The requirement also safeguards a reviewing court's time by

permitting meaningful and efficient review of the ALJ's application of the treating physician rule. *Id*. at 938 (citing *Wilson*, 378 F.3d at 544-45).

### a. The ALJ's assessment of Dr. LaRuffa's opinion is supported by substantial evidence.

The ALJ decided that Dr. LaRuffa's April 22, 2009 assessment was entitled to little weight. (Tr. 21, citing Tr. 521-26). The ALJ determined that although Dr. LaRuffa reported an "extremely limited physical capacity," such as an ability to sit, stand and walk for only one hour each during an eight-hour day, neither plaintiff's report of activities nor Dr. LaRuffa's own treatment notes supported these extreme restrictions. The ALJ noted that to the contrary, Dr. LaRuffa's records showed little in the way of objective findings to support plaintiff's neck pain, the records reflected that plaintiff's condition was mostly stable, and Dr. LaRuffa's treatment generally consisted of refilling or adjusting plaintiff's medications. (Tr. 21).

The ALJ's decision to discount Dr. LaRuffa's opinions is supported by substantial evidence. Dr. LaRuffa's opinions are not entitled to controlling weight as they are not well-supported by medically acceptable clinical and laboratory diagnostic techniques. *See Cole*, 661 F.3d at 937. The ALJ reasonably determined that Dr. LaRuffa's treatment notes show little in the way of objective findings to support plaintiff's neck pain. Although plaintiff was treated at Dr. LaRuffa's practice on a regular basis for a variety of complaints, the treatment notes mention what appear to be neck symptoms[5] only a handful of times. (Tr. 537- February 2008, neck spasms; Tr. 527 - April 2009, spasms and decreased range of lateral motion). The treatment notes do not reflect what type of examination or testing Dr. LaRuffa performed, and there is no

---

[5]The treatment notes are only partially illegible.

indication as to the severity of the symptoms. Aside from these isolated and vague findings, plaintiff has not cited to anything in Dr. LaRuffa's treatment notes to support her findings that plaintiff cannot sit or stand/walk for more than one hour in an eight- hour workday or to show she requires special neck equipment to perform these functions for even these minimal periods of time, as Dr. LaRuffa opined.

In addition, Dr. LaRuffa failed to set forth clinical and objective findings in her evaluation to support the extreme limitations she found. Dr. LaRuffa listed "C3 not repairable" and "Plates and Screws for Degenerative Disc Disease" as the objective bases for plaintiff's subjective complaints of severe neck pain and headaches. (Tr. 522). However, Dr. LaRuffa points to nothing in the medical records indicating that the hardware from plaintiff's fusion was an issue for plaintiff, and the basis for her finding that plaintiff had a disc problem that could not be treated is likewise unclear. Similarly, Dr. LaRuffa did not set forth an objective basis for her finding that plaintiff experiences numbness and tingling in both arms. (Tr. 521). Nor did Dr. LaRuffa identify the medications that cause plaintiff to experience side effects which require her to frequently lie down for rest periods. (Tr. 522, 525). Accordingly, the ALJ was not bound to give Dr. LaRuffa's opinion controlling weight.

Furthermore, the ALJ gave good reasons for discounting Dr. LaRuffa's opinion. The ALJ determined that Dr. LaRuffa's opinion was not consistent with the record and it was not supported by Dr. LaRuffa's own treatment notes and findings. The ALJ specifically determined that the record did not support a diagnosis of irritable bowel syndrome with the need for frequent bathroom visits as found by Dr. LaRuffa. (Tr. 20). The ALJ noted that this condition was not found anywhere else in the treatment record. Given the lack of clinical and objective findings in

19

Dr. LaRuffa's treatment records, the sparse clinical and objective findings in her evaluation, her failure to explain the extreme restrictions she imposed, and the lack of supporting findings by other providers, the ALJ gave valid reasons for discounting the extreme limitations imposed by Dr. LaRuffa and for affording little weight to her assessment. *See Gant v. Commissioner of Social Sec.*, 372 F. App'x 582, 584 (6th Cir. 2010) (ALJ was warranted in discrediting treating physician's opinion where it was not supported by her own treatment notes and was inconsistent with the record as a whole). Accordingly, the ALJ's decision to discount Dr. LaRuffa's opinion is supported by substantial evidence and should be upheld.

### b. The ALJ erred in assessing the treating orthopedic surgeon's opinion.

With respect to Dr. Kahn's September 4, 2008 disability assessment, the ALJ violated the "good reasons" rule established by the Sixth Circuit by failing to discuss Dr. Kahn's assessment of disability. (Tr. 474). Dr. Kahn completed a "Continuance of Disability Claim Form" at the request of plaintiff's long-term disability insurance carrier and opined that plaintiff was "now totally disabled" from "any occupation." (Tr. 474). He also indicated that it was "indefinite" as to when plaintiff would be able to resume any work. *Id.* The Commissioner concedes that the ALJ failed to explicitly address Dr. Kahn's opinion of September 2008 but argues this does not constitute reversible error. (Doc. 11 at 9). The Court disagrees.

An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Blakley*, 581 F.3d at 407. While a violation of the good reasons rule can be deemed to be "harmless error" where the treating doctor's opinion "is so patently deficient that the Commissioner could not possibly credit it," *Wilson*, 378 F.3d at 547, such is not the case here.

20

Although Dr. Kahn's September 2008 opinion that plaintiff is "totally disabled" is not dispositive of the question of disability, his assessment must be read in the context of his long-term treatment of plaintiff, his specialty as an orthopedic surgeon, and his interpretation of the 2008 MRI results which occurred a mere 8 days before he gave his opinion that plaintiff was "totally disabled" from "any occupation."

Dr. Kahn is plaintiff's treating orthopedic surgeon who began treating plaintiff in January 2005. (Tr. 380-82). Dr. Kahn performed plaintiff's cervical spinal fusion surgery in February 2006 and continued to follow plaintiff after her surgery. He examined plaintiff in May 2007 for recurrent symptoms of right arm pain going into her fingers. (Tr. 476). On clinical examination, Dr. Kahn found weakness in the rights side in the biceps and triceps "by about a grade" and a C6 sensory deficit. *Id.* When x-rays showed a solid fusion at C4-5 and C5-6, Dr. Kahn suspected "something going on at C6-7" and ordered an MRI. *Id.* According to Dr. Kahn, the subsequent MRI confirmed his suspicions of not only a problem at C6-7, but at C3-4 as well. At plaintiff's August 27, 2008 examination, Dr. Kahn read the 2008 MRI that he ordered and found "dark disc disease above and below her fusion," as well as "angulations in the disc spaces at both 3-4 and 6-7." (Tr. 472). Dr. Kahn then opined, "I do believe that [this] is really the issue for her." *Id.* Dr. Kahn then noted that additional surgery at the disc sites may be necessary but recommended conservative measures as the initial treatment modality. Eight days later, Dr. Kahn submitted a report to plaintiff's long-term disability insurance carrier that plaintiff was "totally disabled." (Tr. 474).

Although Dr. Kahn identified an objective basis for plaintiff's continuing complaints of arm pain and weakness, the ALJ failed to discuss Dr. Kahn's interpretation of the MRI and his

21

medical conclusions. The ALJ merely noted that Dr. Kahn found "dark disc disease" that "was not read by the radiologist," without addressing Dr. Kahn's additional findings of angulation in the disc spaces and, more importantly, the conclusion Dr. Kahn drew from those findings.

Given Dr. Kahn's specialty as an orthopedic surgeon, his more than three years of treating plaintiff, the objective findings upon which he relied, and his August 27, 2008 clinical examination of plaintiff (a mere 8 days before he completed the disability assessment), the Court cannot say that Dr. Kahn's September 2008 opinion of disability is so patently deficient that the Commissioner could not possibly credit it. The MRI findings as interpreted by Kahn provide an objective basis for plaintiff's continuing pain, limitations, and weakness, and the ALJ was not at liberty to ignore Dr. Kahn's interpretations and conclusions from such findings.

The Commissioner's post hoc rationalizations for the ALJ's actions (Doc. 11 at 9-10)[6] cannot supplant the ALJ's omission in this case. *Blakley*, 581 F.3d at 407. The ALJ's failure to address and discuss Dr. Kahn's opinion of disability is therefore reversible error.

## 2. Plaintiff's third assignment of error is without merit.

Plaintiff contends that the ALJ erred by being highly selective in terms of the evidence and hearing testimony he chose to discuss and cite in his decision. (Doc. 8 at 9-10). Plaintiff provides what she purports to be "one good example" of this, comparing plaintiff's verbatim

---

[6]The Commissioner argues that Dr. Kahn's interpretation of the MRI results in August 2008 does not amount to a functional evaluation of plaintiff which the ALJ was required to address. The Commissioner's argument ignores the close proximity of Dr. Kahn's MRI findings to his assessment of disability – a mere 8 days later– in contravention of the obligation to read the record as a whole when assessing a medical source opinion. *See* 20 C.F.R. § 404.1527(d). The Commissioner also argues the ALJ "indirectly distinguished" Dr. Kahn's opinion by pointing out "the post-surgical MRIs indicated that there was no medical explanation for Plaintiff's symptoms (Tr. 20)." (Doc. 11 at 11). Yet, the Commissioner's argument skirts the precise issue in this case: Dr. Kahn in fact provided a "medical explanation for Plaintiff's symptoms" based on the very MRI cited by the ALJ and the ALJ ignored this explanation. Whether the ALJ had a "good reason" under the legal standards governing disability determinations is not apparent from his decision and warrants a reversal and remand in this case.

testimony describing what her good and bad days are like with the ALJ's summary of her testimony. (*Id.*).

The ALJ is obligated to consider the record as a whole. *See Hurst v. Secretary of Health and Human Services,* 753 F.2d 517, 519 (6th Cir. 1985). It is essential for meaningful appellate review that the ALJ articulate reasons for crediting or rejecting particular sources of evidence. *Morris v. Secretary of Health & Human Services*, No. 86-5875, 1988 WL 34109, at *2 (6th Cir. April 18, 1988). Otherwise, the reviewing court is unable to discern "if significant probative evidence was not credited or simply ignored." *Id.* (citing *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). The ALJ need not provide a "written evaluation of every piece of testimony and evidence submitted. However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Id.* (quoting *Cotter*, 642 F.2d at 705).

The sole example plaintiff provides to show that the ALJ selectively cited to only those portions of the record which support a finding of non-disability fails to demonstrate that the ALJ erred in this regard. Rather, the ALJ's discussion of plaintiff's testimony demonstrates that he thoroughly discussed the limitations plaintiff reported and that he presented an accurate description of her daily activities as she described them. The ALJ summarized plaintiff's testimony as follows: She has headaches all day and she can hardly move. She has pain in the upper body and left arm numbness to the point where she cannot lift anything. She is allergic to pollen and mold and she gets sick easily. Although the neck surgery helped ease her headaches, she still has pain, especially before rain. She takes a number of medications. She has difficulty lifting and carrying objects as she drops them. She cannot stand for more than ten minutes due to

23

dizziness and her legs falling asleep. She can walk half a block but has trouble with tripping and losing her balance. Her ability to sit is limited due to neck and mid-back pain. She has difficulty bending and climbing stairs. She experiences depression to a degree that she sometimes cannot get out of bed. She has lost interest in activities. She wants to avoid people because of her mental problems but does see friends and goes out of the house. (Tr. 18). She has good and bad days, and her activities on good days include "going into the yard, driving into town, working puzzle books, watching television, and spending time in the Jacuzzi." (*Id.*). She has difficulty with reading. The ALJ noted that plaintiff took care of her personal grooming, she seldom cooked, and she did not do housework except to pick up around the house. (*Id.*).

The ALJ's failure to further elaborate on plaintiff's testimony on each of these specific points does not constitute error given the ALJ's thorough discussion of plaintiff's testimony and his extensive evaluation of her subjective complaints and the record evidence. (Tr. 18-22). The ALJ did not err by selectively citing plaintiff's testimony to support a finding of non-disability as plaintiff alleges. The Court is not obligated to comb the record for any other instances where the ALJ may have selectively cited the evidence. Plaintiff's third assignment of error should be overruled.

**E. This matter should be reversed and remanded for further proceedings.**

This matter should be remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of her alleged onset date. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176

24

(6th Cir. 1994). This matter should be remanded for reconsideration of the weight to afford plaintiff's treating orthopedic surgeon consistent with this Report and Recommendation.

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: 2/27/2012

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ANGEL AUBRY,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-139
Dlott, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

26